FILED

AUG 09 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LANCE HERMIZ,<br><br>          Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>          Defendant. | Case No.: 3:18-cv-01035-BEN(KSC)<br><br>**REPORT AND RECOMMENDA-<br>TION RE CROSS MOTIONS FOR<br>SUMMARY JUDGMENT**<br><br>**[Doc. Nos. 13 and 16.]** |

Pursuant to Title 42, United States Code, Section 405(g), of the Social Security Act ("SSA"), plaintiff filed a Complaint to obtain judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying him disability benefits.[1] [Doc. No. 1.]

---

[1] Title 42, United States Code, Section 405(g), provides as follows: "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States. . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive. . . . " 42 U.S.C. §405(g).

1  Pursuant to Title 28, United States Code, Section 636(b)(1)(B), and Civil Local

2  Rules 72.1(c)(1)(c) and 72.2(a), this matter was assigned to the undersigned Magistrate

3  Judge for Report and Recommendation. Presently before the Court are: (1) plaintiff's

4  Motion for Summary Judgment [Doc. No. 13]; (2) defendant's Cross-Motion for Summary

5  Judgment and Opposition to plaintiff's Motion for Summary Judgment [Doc. No. 16];

6  (3) plaintiff's Opposition to defendant's Cross-Motion and Reply to Opposition [Doc. No.

7  19]; (4) defendant's Reply in Support of Cross-Motion for Summary Judgment [Doc. No.

8  20]: and (5) the Administrative Record ("AR") [Doc. No. 10].

9  In his Motion for Summary Judgment, plaintiff argues that his case should either be

10  reversed with instructions for the payment of benefits or reversed and remanded for further

11  proceedings. [Doc. No. 13-1, at pp. 8-9.] Plaintiff challenges the decision denying his claim

12  for disability benefits under the Social Security Act ("SSA"), because he contends the

13  Administrative Law Judge's residual functional capacity assessment lacks the support of

14  substantial evidence given new, conflicting evidence submitted for the first time to the

15  Appeals Council. [Doc. No. 13-1, at pp. 4-8.] Defendant argues remand is unwarranted

16  because substantial evidence continues to support the Administrative Law Judge's decision

17  notwithstanding plaintiff's later-submitted evidence. [Doc. No. 16-1, at p. 7, 8-18.]

18  After careful consideration of the moving and opposing papers, as well as the

19  Administrative Record and the applicable law, it is RECOMMENDED that the District

20  Court affirm the ALJ's decision to deny benefits by issuing an order GRANTING

21  defendant's Motion for Summary Judgment [Doc. No. 16] and DENYING plaintiff's

22  Motion for Summary Judgment [Doc. No. 13].

### *Background and Procedural History*

### I. *Procedural History.*

25  On or about December 19, 2013, plaintiff filed applications for disabled child's

26  insurance benefits under Title II of the SSA and for supplemental security income benefits

27  under Title XVI of the SSA, alleging disability beginning June 4, 2012. [Doc. No. 10-5, at

28  pp. 2-11.] In Disability Reports (Forms SSA-3367 and SSA-3368), which were completed

1  in connection with his application [Doc. No. 10-6, at pp. 2-12], plaintiff reported he was
2  unable to work because of issues with anger and aggression; Asperger's syndrome;
3  depression; learning disability; and inability to follow simple directions. [Doc. No. 10-6,
4  at p. 6.]

5      Letters dated January 7, 2013 and February 11, 2014 notified plaintiff that he did not
6  qualify for disability benefits because his medical conditions were not severe enough to
7  prevent him from working. [Doc. No. 10-4, at pp. 2-6, 9-13.] Plaintiff requested
8  reconsideration of this decision [Doc. No. 10-4, at pp. 17-18], but his request for benefits
9  was denied once again on August 11, 2014. [Doc. No. 10-4, at pp. 19-24.]  On
10 September 30, 2014, plaintiff requested a hearing before an Administrative Law Judge
11 ("ALJ").  [Doc. No. 10-4, at pp. 25-26.]  The ALJ hearing was held on October 4, 2016.
12 [Doc. No. 10-2, at pp. 52-101.]  On December 1, 2016, the ALJ issued a written opinion
13 concluding that plaintiff did not qualify for disability insurance benefits under the SSA.
14 [Doc. No. 10-2, at pp. 27-37.]

15     On January 30, 2017, plaintiff requested review of the ALJ's decision by the Appeals
16 Council. [Doc. No. 10-4, at pp. 82-83.]  While this request for review was pending before
17 the Appeals Council, plaintiff's counsel submitted additional medical and other records
18 that fall into three categories:  (1) duplicates of records already submitted; (2) records
19 generated prior to the ALJ's decision that had not previously been submitted; and (3) new
20 records generated while plaintiff's request for review was pending before the Appeals
21 Council. [Doc. No. 10-2, at pp. 12-19, 43-49; 102-133.]

22     In a letter dated April 19, 2018, the Appeals Council addressed the new evidence
23 submitted by plaintiff's counsel but denied review of the ALJ's decision. [Doc. No. 10-2,
24 at pp. 1-5.]  The Appeals Council concluded that any new records generated prior to the
25 ALJ's December 1, 2016 denial were not enough to show a reasonable probability that it
26 would change the outcome of the ALJ's decision.  As to the additional records generated
27 after the ALJ's decision, the Appeals Council stated that the ALJ only decided plaintiff's
28 case through December 1, 2016.  As a result, it was the view of the Appeals Council that

these records were not relevant, because they did not "relate to the period at issue." [*Id.* at p. 3.] The ALJ's decision became the final decision of the Commissioner as of April 19, 2018, when the Appeals Council issued its letter concluding there was no basis to change the ALJ's determination that plaintiff is not disabled. *See* 20 C.F.R. § 404.981. Plaintiff then filed the Complaint in this action on May 24, 2018. [Doc. No. 1.]

**II.    *Standards of Review – Final Decision of the Commissioner.***

The final decision of the Commissioner must be affirmed if it is supported by substantial evidence and if the Commissioner has applied the correct legal standards. *Batson v. Comm'r of the Social Security Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). Under the substantial evidence standard, the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the record to support more than one rational interpretation, the District Court must defer to the Commissioner's decision. *Id.* "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel,* 240 F.3d 1157, 1162 (9th Cir. 2001). "In determining whether the Commissioner's findings are supported by substantial evidence, we must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater,* 80 F.3d 1273, 1279 (9th Cir. 1996).

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)." Summary judgment motions, as defined by Fed. R. Civ. P. 56, contemplate the use of evidentiary material in the form of affidavits, depositions, answers to interrogatories, and admissions. and admissions." *Kenney v. Heckler*, 577 F. Supp. 214, 216 (N.D. Ohio 1983). In Social Security appeals, however, the Court may "look no further than the pleadings and the transcript of the record before the agency," and may not admit additional evidence. *Morton v. Califano,* 481 F. Supp. 908, 914 n. 2 (E.D. Tenn. 1978); 42 U.S.C. § 405(g). "Therefore, although summary judgment motions are customarily used [in social security cases], and

4

1  even requested by the Court or Magistrate, such motions merely serve as vehicles for
2  briefing the parties' positions and are not a prerequisite to the Court's reaching a decision
3  on the merits." *Kenney v. Heckler*, 577 F. Supp. at 216.

4  **III.** ***Evidence in the Administrative Record.***

5       ***A.*** ***Forms Submitted by Plaintiff to Support His Disability Claim.***

6       A Disability Report prepared at the time plaintiff submitted his application states
7  that his ability to work is limited by the following conditions: (1) anger issues and
8  aggression; (2) Asperger's syndrome; (3) depression; (4) learning disability; and (5)
9  inability to follow simple directions. [Doc. No. 10-6, at p. 6.] The Disability Report also
10 states plaintiff completed the twelfth grade, attended special education classes while in
11 school, but had no work history. [*Id.* at pp. 6-7.]

12      On January 23, 2014, plaintiff submitted a Function Report in support of his
13 disability claim. [Doc. No. 10-6, at pp. 24-32.] In this report, plaintiff represented that he
14 has no problem handling his own personal care, but he needs his mother to remind him to
15 take care of grooming and to take his medications. [*Id.* at pp. 25-26.] Plaintiff also stated
16 in this report that he does not drive, but he is able to go out on his own. [*Id.* at p. 27.]
17 However, the report represents that plaintiff "rarely" leaves the house, and he spends most
18 of his days doing nothing or watching television. [*Id.* at pp. 25-28.] Plaintiff also reported
19 he does not pay bills or handle a bank account and handling money gives him anxiety. [*Id.*
20 at p. 27.] According to this report, plaintiff's conditions affect his memory, ability to
21 complete tasks, concentration, understanding, and ability to follow instructions. [*Id.* at
22 p. 29.] At this time, it was represented that plaintiff was taking two medications to treat
23 his conditions: Alprazolam[2] and Fluoxetine[3]. [*Id.* at p. 31.] Plaintiff also reported
24 experiencing several side effects from these medications, including drowsiness, headaches,
25 nausea, diarrhea, sleepiness, and a lack of interest in anything. [*Id.*]

26

27

28 [2] Sometimes sold under the brand name Xanax.
   [3] Sometimes sold under the brand name Prozac.

Plaintiff's mother, Layla Hermiz, also completed a Third-Party Function Report on January 23, 2014. The report completed by Ms. Hermiz reiterated many of the statements in plaintiff's Function Report. [Doc. No. 10-6, at pp. 14-22.] Ms. Hermiz also stated plaintiff is only capable of paying attention for "less than half [a] minute." [*Id.* at p. 19.] Additionally, Ms. Hermiz said it is "very hard" for plaintiff to follow written instructions, and he will "get lost" when trying to follow spoken instructions. [*Id.*] Ms. Hermiz further reported that plaintiff responds to stress with anger, crying, and trying to harm himself and others, and that he does not respond well to changes in routine. [*Id.* at p. 20.] Ms. Hermiz also noted plaintiff sometimes talks to himself. [*Id.*] In addition, Ms. Hermiz indicated that plaintiff experiences side effects due to his medications, but she did not specify what those side effects were. [*Id.* at p. 21.]

## B.   *Chronological Summary of Records.*

### 1.   *School Records.*

The documents in the administrative record include some of plaintiff's school records for the period April 1, 2003 through November 6, 2012. [Doc. No. 10-6, at pp. 65-84; Doc. No. 10-7, at pp. 4-76.] For example, standardized testing scores back as far as April 1, 2003, when plaintiff was in the 3rd grade, indicate he was in the "Far Below Basic" range in math and language arts. [Doc. No. 10-7, at p. 76.]

On October 16, 2007, when plaintiff was thirteen years old and in the 8th grade, school psychologist Tiffany K. Brewer, M.S., completed a psychoeducational evaluation of plaintiff as part of a re-evaluation for special education services. [Doc. No. 10-7, at pp. 46-59.] A classroom observation of plaintiff revealed his behavior was appropriate most of the time, he worked well in cooperative groups, and he contributed to discussions and tasks when prompted by an adult. [*Id.* at p. 47.] However, plaintiff had difficulty staying focused for extended periods of time. [*Id.*] Tests conducted in relation to this evaluation indicate plaintiff was functioning "within the low average range of cognitive ability." [*Id.* at p. 56.] A speech/language assessment was also conducted around the same time by Linda McWilliams, and her October 31, 2007 report concluded plaintiff's "overall receptive and

expressive language" were in the "low average range," and his "[h]igher level, abstract language skills and social language/awareness" were "significantly delayed." [*Id.* at p. 71.]

The most recent Individualized Education Plan in the record is dated September 14, 2011, when plaintiff was in the 12th grade. At this point in time, he was reportedly struggling with reading in class and reading comprehension because of his "slow processing speed." [Doc. No. 10-7, at pp. 29, 45.] He also had trouble writing multi-paragraph essays, answering basic questions in complete sentences, completing simple math questions, and reading social cues appropriately. [*Id.* at p. 29.] Current teachers indicated plaintiff sometimes laughed out loud while daydreaming, knocked into things, was visually distractible, irritated by sounds, slow moving or slow to start activities, and lacked appropriate social interaction. [*Id.*] However, current teachers also said plaintiff typically completed his work in a timely manner and utilized an organized folder to keep track of his assignments. [*Id.*] Supplementary aids and services were continued. [*Id.* at pp. 39-43.] Plaintiff graduated from high school in 2012. [Doc. No. 10-7, at p. 170.]

In December 2012, plaintiff participated in a vocational consultation through Grossmont Union High School District's Special Education Career Center to help him identify interests and appropriate classes, activities, and experiences to increase career awareness and work-related skills for successful adult employment. [Doc. No. 10-7, at pp. 61-64.] At the time of this vocational consultation, plaintiff was participating in a "WorkAbility" program that helps students learn about applying for jobs, interviewing, and creating a work portfolio. He expressed an interest in obtaining work in food services and said his favorite class was Food/Nutrition. [*Id.* at p. 61.] Recommendations included job shadowing, volunteering, internship and apprenticeship programs, and participation in a California Department of Rehabilitation program designed to help individuals with disabilities prepare for and achieve employment. [*Id.* at p. 62.]

### 2. *San Diego Regional Center Records.*

In early 2014, when he was nineteen years old, plaintiff visited the San Diego Regional Center ("Regional Center") to gain assistance in finding employment. On

March 3, 2014, plaintiff, plaintiff's mother, and a service coordinator with the Regional Center met in person to discuss plaintiff's eligibility for the program. [Doc. No. 10-7, at pp. 168-172.] A Social Summary prepared after the meeting indicates plaintiff met the service coordinator with an appropriate greeting and spoke in a calm and relaxed manner. [*Id.* at p. 168.] However, plaintiff had difficulty formulating answers to questions and needed some prompting to complete his thoughts. [*Id.* at pp. 168-169.] While plaintiff appeared alert, he also presented with a lethargic affect and yawned multiple times. [*Id.*] Plaintiff appeared neat and well-groomed. [*Id.*]

During this meeting, plaintiff stated he would like to find a job, and he expressed interest in working in a kitchen as a chef's assistant. [Doc. No. 10-7, at p. 170.] Plaintiff mentioned he had support through the Department of Rehabilitation, and that he had 100 hours working as a chef's assistant. [*Id.*] Plaintiff's mother expressed frustration that the Department of Rehabilitation program was not doing enough for plaintiff, but plaintiff accused his mother of not following up on appointments that were set for him. [*Id.*] Plaintiff also stated he had been helping at his father's liquor store two days a week but only receives minimal payment from this work. [*Id.*] Plaintiff described this work as involving using the cash register, customer service, and restocking shelves. [*Id.*]

The service coordinator also discussed plaintiff's anger issues at this meeting. Both plaintiff and his mother reported that he can become physical and aggressive when he is angry. [Doc. No. 10-7, at p. 170.] Plaintiff reported physically attacking his mother twice in the past. [*Id.*] On one occasion, plaintiff pushed his mother violently, and on another occasion, he attempted to strangle her while she was driving. [*Id.*] Plaintiff's mother did not express any concern about plaintiff continuing to be violent and aggressive, and stated she expects him to grow out of the behavior. [*Id.*] Other than these anger control issues, plaintiff had no problems with safety. [*Id.* at p. 171.] Plaintiff was taking Abilify for depression and anxiety and Alprazolam for anger control. [Id. at p. 171.]

A Regional Center intake form dated May 1, 2014 indicates that a physician, psychologist, and social work counselor all agreed that plaintiff was eligible for services.

8

[Doc. No. 10-7, at p. 183.] The form states that plaintiff has a substantial disability which results in substantial functional limitations in communication skills, self-direction, capacity for independent living, and economic self-sufficiency. [Id.]

On May 19, 2014, plaintiff created an Individual Program Plan with Regional Center representative Dave Richert. [Doc. No. 10-6, at pp. 105-111; Doc. No. 10-7, at p. 158.] The plan states that the Regional Center will provide case management services and identify appropriate supported employment options for plaintiff, and plaintiff will "apply consistently for employment" and for culinary arts programs at area colleges. [Doc. No. 10-6, at p. 100-101; Doc. No. 10-7, at p. 158.]

A service coordinator from the Regional Center, Carissa Nunez, met with plaintiff and his mother on July 30, 2014 to discuss plaintiff's employment history and the type of job he wished to find. She indicated she would contact supportive employment agencies to assist him with finding employment. [Doc. No. 10-6, at p. 114.]

On August 15, 2014, Ms. Nunez spoke with plaintiff's mother by phone to let her know she submitted "several packets to supportive work agencies" and was following up on these applications. [Doc. No. 10-6, at p. 114.] Ms. Nunez contacted plaintiff's mother again on August 28, 2014 to inform her that two of the agencies she contacted determined that plaintiff would not be a good fit for their program because of his history of behavioral concerns." [Id.] However, she spoke with "Employment and Community Options," and they would review information to determine whether plaintiff was a good match for their program. [Id.] On September 8, 2014, Ms. Nunez reported to plaintiff's mother that "NOR ADC" determined plaintiff would not be a good fit for their program, but she sent plaintiff's referral pack to several new agencies and would follow up the next week. [Id. at p. 115.]

On September 18, 2014, Ms. Nunez received a call from Community Interface Services ("CIS") and was informed that plaintiff "would be a great fit for the individual placement employment program," but there were currently no openings with a job developer. However, openings were expected "in the near future," and plaintiff indicated he would be willing to wait for an opening. [Doc. No. 10-6, at pp. 115-116.] However, on

9

October 6, 2014, Ms. Nunez advised plaintiff's mother that plaintiff "would have to wait several months" until CIS had an opening in their program, but two other agencies were interested in meeting with plaintiff. [*Id.* at p. 116.]

On November 24, 2014, Ms. Nunez called plaintiff's mother to update her on the search for supportive employment agencies. One program referred to as "PWI" determined that plaintiff was not a good fit, because he worked with the agency about a year ago and did not have a good attendance record for work. In addition, Ms. Nunez indicated that, "The contract services department did not feel that [plaintiff] was a good fit for their program because he was reportedly falling asleep during the agency tour and appeared very uninterested." [*Id.* at p. 117.] However, Ms. Nunez sent a referral to Community Catalysts and she would follow up with CII regarding program openings." [*Id.*]

Plaintiff began working with a CIS Job Developer on June 29, 2015, and on July 24, 2015, the job developer indicated that an interview for a prep chef position at a restaurant had been scheduled for the following week. In addition, the job developer expected to have several openings in retail stores. [Doc. No. 10-6, at p. 118.]

On September 15, 2015, CIS completed an Individual Support Plan/Annual Review for the objective period beginning October 2015. [Doc. No. 10-6, at pp. 128-130.] This plan states that plaintiff had applied for jobs at multiple places, including Home Goods, T.J. Maxx, Panera Bread, and Submarina, but had not secured employment. [*Id.* at p. 129.] The plan also states that plaintiff was motivated to find a job but would benefit from additional practice with interviewing skills. [*Id.*]

### 3. *Psychiatric Treatment Records/Melissa Evelyn Deer, M.D.*

The administrative records include psychiatric treatment notes beginning on September 12, 2011. These early records indicate plaintiff was treated for depression and anxiety by Richard Heidenfelder, M.D., and Harry D. Schwerdtfeger, M.D. [Doc. No. 10-7, at pp. 83-103.] For the most part, these doctors prescribed various medications and then made minor adjustments with varying results. For example, on December 5, 2013, Dr. Schwerdtfeger noted plaintiff was responding to Abilify. He was "feeling better" and

was happy with the results. His mother also commented he was "getting back to [his] old self." [*Id.* at p. 95.] However, on January 14, 2014, plaintiff reported to Dr. Heidenfelder that he had stopped taking his medication and had quickly become depressed and anxious again. [*Id.* at p. 98.] Dr. Heidenfelder restarted plaintiff on Prozac and Xanax and discussed increasing the dosage of Xanax to address "initial insomnia." [*Id.*]

The most relevant psychiatric treatment records start on September 8, 2015, when plaintiff had his first appointment with Melissa Evelyn Deer, M.D., who is a specialist in family medicine and psychiatry. [Doc. No. 10-2, at p. 19.] Dr. Deer completed an initial physical evaluation of plaintiff at the San Diego American Indian Health Center. [Doc. No. 10-8, at pp. 14-16.] Plaintiff's mother referred him to Dr. Deer, because she believed he needed a new psychiatrist. [*Id.* at p. 14.] Plaintiff told Dr. Deer that he was taking Prozac, and it was helping him to manage his emotions. He also reported sleeping "pretty good" and said he was uncertain when he last had a depressive episode. [*Id.*] Dr. Deer noted plaintiff presented with good hygiene, made fair eye contact, and had no psychomotor abnormalities. [*Id.* at p. 15.] Additionally, Dr. Deer noted that plaintiff's speech was monotone and nonspontaneous, but it had a regular rate, rhythm, and volume. [*Id.* at pp. 15-16.] Although plaintiff's affect was constricted, his mood was "pretty good" and his attention and concentration were intact. [*Id.* at p. 16.] Plaintiff told Dr. Deer he had previously worked at an elder care facility in the kitchen but was currently awaiting a decision on another job at T.J. Maxx. [*Id.* at p. 15.]

On December 10, 2015, plaintiff reported to Dr. Deer that he was depressed and had been sleeping approximately twelve hours during the day and getting limited sleep at night. [Doc. No. 10-8, at p. 17.] Dr. Deer assessed plaintiff as having a very poor functional status, likely resulting from his depression and reversed sleep/wake cycle. [*Id.* at p. 18.] Dr. Deer adjusted plaintiff's medications and recommended therapy and structured social activity outside the home. [*Id.*]

On January 14, 2016, plaintiff told Dr. Deer he was doing better. [Doc. No. 10-8, at p. 20.] At a previous appointment, Dr. Deer began a trial of WBT to address plaintiff's

11

depressive symptoms. [*Id.*] Plaintiff believed this medication helped him to stay awake during the day and asleep during the night, but noted the effect was fading. [*Id.*] Plaintiff's mother reported that he was still sleeping a lot and had low energy, but he tolerated the medication well without any side effects. [*Id.*] Plaintiff's mother said he still did not have any structured activity outside the home, but they were waiting for a referral from a program to help him find work. [*Id.*]

At the next follow-up appointment on April 11, 2016, plaintiff described his mood as good and denied feeling depressed. [*Id.*] However, plaintiff's mother expressed continued concern over his sleep schedule. [*Id.*] Plaintiff was attending a vocational training program though the Regional Center once per week and had a new case manager but was only receiving minimal services. [*Id.*] Dr. Deer "STRONGLY encouraged [plaintiff's] mother to follow up with the case manager and to pursue other resources." [*Id.* at p. 28.]

### 4. *Assessments by Examining Physicians.*

On December 18, 2012, a year before plaintiff's current application for benefits was submitted, plaintiff appeared for a complete psychological evaluation, including testing, by Dan Whitehead, Ph.D., Q.M.E. [Doc. No. 10-7, at pp. 85-91.] During this examination, plaintiff reported as follows: "I'm fine really, I'm working part time now at a kitchen of an eldercare facility and would work more if they give me hours." [*Id.* at pp. 86.] He started this job of "cook trainee" several weeks before his consultation with Dr. Whitehead and had been working 20 to 30 hours per week. Plaintiff said the job was "going well." [*Id.* at 87.] Plaintiff informed Dr. Whitehead that he had some prior history of mental health treatment, including ongoing medication treatment for "a little bit of depression." [*Id.*] He also told Dr. Whitehead that he was in special education classes during school and graduated from high school in 2012. [*Id.*] In addition, plaintiff reported he was able to take care of his personal hygiene and perform most daily living activities, such as preparing simple meals and doing household chores. [*Id.* at p. 87.] Although plaintiff indicated he did not drive, he said he was able to take public transportation. [*Id.*]

In the mental status section of his evaluation, Dr. Whitehead noted plaintiff appeared alert and coherent; seemed well oriented to time, place, person, and situation; and appeared to have good personal hygiene. [Doc. No. 10-7, at p. 87.] Additionally, plaintiff's speech was understandable, clear, and normal in tone and volume. [*Id.* at p. 88.] Plaintiff's mood appeared stable and euthymic. [*Id.*] His affective reactions were appropriate, normal and seemed full range. [*Id.*] Dr. Whitehead described plaintiff's thought process as "unremarkable." [*Id.*] In addition, Dr. Whitehead's report states that plaintiff was able to "perform Serials 7s at a good level of ability," spell "world" both forwards and backwards, and solve basic math calculations. [*Id.*]

Testing was completed in connection with Dr. Whitehead's assessment, including the Wide Range Achievement Test, a Trails A&B examination, the Wechsler Adult Intelligence Scale, and the Wechsler Memory Scales. [Doc. No. 10-7, at pp. 89-90.] While plaintiff tested at the twelfth-grade level for word reading and at the eleventh-grade level for spelling, his math computation skills were only at a fourth-grade level. [*Id.*] According to Dr. Whitehead, plaintiff's verbal comprehension, working memory, and general ability were in the low average range; and his perceptual reasoning, processing speed, and full-scale IQ score were in the borderline range. [*Id.*] Based on his personal observations and the psychological and neuropsychological testing conducted in connection with his assessment, Dr. Whitehead concluded as follows:

> Based on the intellect and cognitive abilities demonstrated by the claimant during this evaluation, he seems capable of functioning at a variety of work activities that require simple tasks performed at a constant level. Barring other problems and concerns, persons with intelligence and memory functions in the borderline range and above are usually able to perform a wide variety of work functions of a simple nature on a constant basis. This would be consistent with his current part time work situation.

[Doc. No. 10-7, at p. 90.]

On April 4, 2014, plaintiff appeared for a psychological evaluation by Sharon D. Weld, Ph.D., to assess his current level of intellectual and adaptive functioning and to help

determine his eligibility for the Regional Center. [Doc. No. 10-7, at pp. 162-167.] Plaintiff was cooperative and polite during the examination but showed no emotional or social engagement in relation to Dr. Weld or the testing and was hesitant in making eye contact. [*Id.* at p. 165.] "His face remained impassive; he did not respond at all to the examiner's several efforts at support, humor or engagement. . . .  In conversation after the testing, [plaintiff] also responded to questions about his interests and social life easily but very briefly and often with little clarifying detail.  For example, he said that he was interested in martial arts, but he was unable to name any particular martial arts that he liked despite considerable effort by the examiner to find out." [*Id.* at p. 165.]  Dr. Weld noted plaintiff's presentation appeared to meet the criteria for a diagnosis of Asperger's Disorder (Autism Spectrum). [*Id.* at pp. 166-167.]  Test results indicated plaintiff had borderline functioning in perceptual reasoning, working memory, and processing speed.   His verbal comprehension was "average overall." [*Id.*]

On April 9, 2014, Mary Jane Pionk, M.D., a Developmental Behavioral Physician Consultant for the Regional Center, completed a medical evaluation of plaintiff. [Doc. No. 10-7, at pp. 173-178.] Dr. Pionk noted that plaintiff was neatly groomed and appeared to have a normal thought process. [*Id.* at p. 176.] Plaintiff responded appropriately to questions, although he occasionally forgot what was asked and would have to ask for the question to be repeated. [*Id.*]  Based on the information available to her, Dr. Pionk noted that plaintiff's anxiety and depression were stable on his current medications. [*Id.* at p. 177.]  Dr. Pionk concluded that plaintiff may benefit from a program at the Regional Center that involves job coaching, and life building skills. [*Id.* at p. 178.]

### 5.    *Assessments by Non-Examining Physicians.*

Plaintiff's December 17, 2013 claim for benefits was reviewed by two state agency physicians.  First, on February 11, 2014, N. Haroun, M.D., reviewed records from Dr. Heidenfelder, Kaiser, Valhalla High School, and Dr. Whitehead, as well as the function reports submitted in connection with plaintiff's applications for disability benefits. [Doc. No. 10-3, at pp. 14-18.]  Dr. Haroun noted there were inconsistencies

14

1   between the reports on file and the plaintiff's allegations, but he found the nature and

2   severity of his impairments and functional limitations to be partially credible. [*Id.* at p.

3   15.] It was Dr. Haroun's view that plaintiff had mild difficulties in social interactions

4   and in completing multi-step directions, but his impairments were not severe enough for

5   him to be considered disabled. [*Id.* at pp. 16-18.] Dr. Haroun applied SSA's Psychiatric

6   Review Technique (PRT) to the evidence in the record and concluded plaintiff did not

7   have a severe impairment that met the "A" or "B" criteria of Listing 12.05, Intellectual

8   Disability, or Listing 12.06, Anxiety Related Disorders. [*Id.* at p. 16.] According to

9   Dr. Haroun, plaintiff did not meet the criteria of the listings, because he had no

10   restrictions in his activities of daily living; and only mild restrictions in social functioning

11   and maintaining concentration, persistence or pace. Dr. Haroun also noted there was no

12   evidence of any episodes of decompensation. [*Id.*] In addition, Dr. Haroun found that

13   the medical treatment notes did not include any evidence of a severe impairment. Rather,

14   plaintiff was being treated for mood and sleep problems, and the psychiatrist made only

15   slight adjustments in the dosage of his medications over time. [*Id.* at pp. 16-17.]

16   According to Dr. Haroun, the "most objective exam" in the file was the complete

17   psychological evaluation prepared by Dr. Whitehead on December 18, 2012, which

18   indicated plaintiff had some mild difficulties in social interactions and in completing

19   multi-step directions but did not have a severe impairment that limited his physical or

20   mental ability to do basic work activities. [*Id.* at 17.] Based on the record, Dr. Haroun

21   concluded plaintiff's condition and limitations were not severe enough for him to be

22   considered disabled. [*Id.* at 18.]

23        Second, in connection with plaintiff's request for reconsideration of the denial of his

24   December 17, 2013 applications for disability benefits, a state agency psychiatric

25   consultant, Paul Klein, Psy.D., completed a review of plaintiff's records on August 9, 2014.

26   [Doc. No. 10-3, at pp. 46-52; 59-65.] Dr. Klein also applied the SSA's PRT but considered

27   whether plaintiff met the "A" and "B" criteria of Listing 12.02, Organic Mental Disorders;

28   Listing 12.06, Anxiety Related Disorders; and Listing 12.10, Autistic Disorder and Other

3:18-cv-01035-BEN(KSC)

Pervasive Developmental Disorders. [*Id.* at 46-47; 59-60.] Dr. Klein concluded plaintiff had two severe impairments: borderline intellectual functioning and autistic disorder. [*Id.* at pp. 46; 59.] However, Dr. Klein found that these impairments did not meet the "B" or "C" criteria of the Listings. It was Dr. Klein's opinion that plaintiff had only mild restrictions in his activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, and pace. [*Id.*] Dr. Klein also believed the evidence of record showed that plaintiff could understand and remember simple and some detailed tasks; perform one to two step tasks; accept instructions from supervisors but not work with the public; "interact superficially with co-workers; and "adapt to planned and simple change in most routine work-like settings." [*Id.* at pp. 47; 60.] In addition, Dr. Klein completed a Mental Residual Functional Capacity Assessment (MRFC) and an Assessment of Vocational Factors. [*Id.* at pp. 48-51; 61-65.] Despite some "marked" and "moderate" limitations, Dr. Klein believed plaintiff was capable of work and was not disabled. [*Id.*]

### C. *Administrative Hearing.*

As noted above, the ALJ conducted an administrative hearing on October 4, 2016, and plaintiff was represented by counsel at the hearing. [Doc. No. 10-2, at pp. 52-53.] Counsel's position at the hearing was that plaintiff's symptoms met or equaled one or more of the following listings in the SSA's Listing of Impairments: 12.04, Depressive Disorder; 12.05 Intellectual Disorder; 12.05, Anxiety Disorder; or 12.10 Autism Spectrum Disorder. [Doc. No. 10-2, at p. 53.] The following is a summary of the testimony given at the ALJ hearing and considered by the ALJ in reaching his decision to deny benefits:

### 1. *Plaintiff's Testimony.*

Plaintiff testified he was twenty-two years old and lived at home with his mother and younger brother. [Doc. No. 10-2, at pp. 54-55.] He stated he completed high school and graduated within a special education class. [*Id.*] Plaintiff stated he has not been employed and did not know if he could maintain a full-time job. He has been working with Community Interface, which works with the Regional Center, to obtain employment. For

about two years, he had been meeting with a job developer/counselor, applying for work with the job developer's help. Although he has had a few interviews, he has not been employed and has been unsuccessful in obtaining even a part-time job. [*Id.* at pp. 55-57; 63-64.] However, his job developer told him there were a few places that were interested in him, but they had not yet decided. [*Id.* at pp. 56-57.] Most recently, he applied for a full-time job as a courtesy clerk at a grocery store, which would involve collecting shopping carts from outside. Physically, plaintiff believes he could do the job, but he might be anxious about his personal safety if he had to go outside at night. [*Id.* at pp. 64-65.]

Plaintiff further testified that he is easily distracted and has a hard time remembering things, so he relies on his mother to remind him to complete tasks. [Doc. No. 10-2, at pp. 56, 58, 65.] He spends most of his time sleeping but sometimes helps with chores around the house, such as washing dishes. About once a month, plaintiff goes out with a friend to an event, such as a movie. [*Id.* at pp. 61, 65, 68-69.] He has not been motivated to take a driver's license test, so he does not have a driver's license, and his mother takes him to doctor's appointments. [*Id.* at p. 62.] However, there is a taco shop close to plaintiff's home, and he testified he can walk there by himself to get something to eat. When he buys food, he does not have any problems figuring out if he received the correct change back. [*Id.* at pp. 70-71.] Plaintiff was also able to demonstrate to the ALJ that he could read and do simple math problems, such as counting. [*Id.* at pp. 71-73.]

Plaintiff told the ALJ that he frequently helps at his father's liquor store on the weekends by doing general tasks, such as stocking shelves and cleaning, and he has been doing this for the past six or seven years. [Doc. No. 10-2, at pp. 74-77; 78-79.] Over the last weekend, he worked seven hours on Saturday and thirteen hours on Sunday. He has a debit card and his father puts money in his account for helping at the liquor store. Plaintiff occasionally handles the cash register, but he finds it very difficult because he has a hard time remembering the correct prices. [*Id.*] He believes it would be too much stress and pressure for him to work full time at his father's store, because he would make a lot of

mistakes at the cash register because he cannot remember a lot of prices. [*Id.* at 78-79.] His father has sometimes scolded him for making mistakes. [*Id.* at 80-81.]

Plaintiff testified he had been seeing a psychiatrist, Dr. Deer, for depression and anxiety. [Doc. No. 10-2, at p. 57.] He described his symptoms of depression as "hav[ing] no energy or motivation" and sleeping a lot. [*Id.* at p. 58.] Plaintiff also said he suffers from anxiety when experiencing stress or "being put under a lot of pressure." [*Id.* at p. 58.] At the time of the hearing, plaintiff was taking Prozac and Wellbutrin to help with his anxiety and depression. [*Id.* at p. 73-74.] Plaintiff said these medications helped "a little," and he didn't experience any bad side effects while taking them. [*Id.*]

## 2. *Testimony by Plaintiff's Mother, Layla Yousif Hermiz.*

Plaintiff's mother testified that she did not think her son could manage a full-time job. [Doc. No. 10-2, at pp. 82-83.] For a couple of months, he worked in a kitchen at a hospice, and they were hoping he would be hired. However, he was not hired because it is very hard for him to follow instructions, and he is forgetful, so someone must be next to him to tell him what to do. [*Id.*] According to Ms. Hermiz, plaintiff needs multiple reminders to do chores and to take care of personal hygiene, and he has no patience to do something for longer than half an hour. [*Id.* at pp. 82-83, 85, 89.]

Ms. Hermiz does not believe plaintiff could work as a courtesy clerk at a grocery store, because he would need constant reminders to go back out and look for more carts. [Doc. No. 10-2, at p. 94.] When plaintiff helps at his father's liquor store, Ms. Hermiz claims that his brothers do all the work and plaintiff just walks around. The father gives him a small allowance, and he does not want to give it to him for nothing, so he makes him go to the store even though he is not really working. [*Id.* at p. 90.] However, Ms. Hermiz did indicate plaintiff could leave the house, purchase food at nearby restaurants, and come back without any assistance. [*Id.* at p. 91.]

Ms. Hermiz also testified that plaintiff has a history of anger issues and has hit her in the past. [*Id.* at p. 86.] At the time of the ALJ hearing, it had been about two years since plaintiff hit Ms. Hermiz. [*Id.* at p. 93.] However, plaintiff still exhibited other unusual

18

behaviors, including talking to himself and screaming. [*Id.* at pp. 84, 91, 92.] Ms. Hermiz claimed plaintiff had been talking to himself daily since he was little. [*Id.* at p. 92.]

### 3. *Testimony by Vocational Expert Susan L. Allison, M.S.*

The final witness at the hearing was Vocation Expert Susan L. Allison, M.S. According to her Curriculum Vitae, Ms. Allison has a Master of Science Degree in Counseling. She has many years of experience in this field and has other credentials in vocational rehabilitation and counseling. [Doc. No. 10-6, at pp. 97-101.]

The ALJ presented Ms. Allison with four hypotheticals. First, the ALJ asked whether work would be available for an individual with the following residual functional capacity who could work at any exertional level: Unskilled; low stress; low concentration; low memory; unable to work with the general public, crowds, or co-workers; occasional contact with co-workers; ability to tolerate occasional changes in a routine work setting; only able to remember and carry out simple work instructions and use good judgment to make simple, work-related decisions; unable to do any reading or math calculations in his head while working. [Doc. No. 10-2, at pp. 96-100.] Ms. Allison responded there were at least two jobs available in the national economy for a person with these limitations: garment or laundry bagger and vehicle cleaner. [*Id.* at p. 97.] However, 10 to 15 percent of the available jobs would be part time. [*Id.*]

Second, Ms. Allison was asked by the ALJ to consider whether work would be available for an individual with the above-described residual functional capacity who was only capable of "low production." [*Id.* at p. 98.] It was Ms. Allison's view that a garment or laundry bagger would be considered "low production," because "[y]ou are working pretty much at your own pace." [*Id.*] However, Ms. Allison testified that production level is "employer driven." [*Id.*] For example, if you work at UPS cleaning trucks, they would probably expect you to clean a certain number each day, but you would still be working at your own pace. According to Ms. Allison, the job of "vehicle cleaner" would be "low to average" production, and it would be up to the employer to determine "how strict they are on the amount of work they expect." [*Id.*]

19

Third, Ms. Allison was asked whether an individual with the above-described residual functional capacity could work as garment or laundry bagger or vehicle cleaner if it was determined by his supervisors within the first 30 days that his performance was at least 15 to 20 percent "below average." [*Id.* at pp. 98-99.] Ms. Allison responded that she did not believe such an individual would "pass the probationary period." [*Id.* at 99.]

Fourth, the ALJ asked whether an individual with the above-described residual functional capacity could work as a garment or laundry bagger or vehicle cleaner if he had "average performance" but "unscheduled absenteeism" (*i.e.*, he walked off the job when he got bored or frustrated about three to four eight-hour days per month). Ms. Allison responded that this type of absenteeism would not be tolerated. [*Id.* at 99.]

## ***Discussion***

### *I.* *The ALJ's Five-Step Disability Analysis.*

To qualify for disability benefits under the SSA, an applicant must show that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months. 42 U.S.C. § 423(d). The Social Security regulations establish a five-step sequential evaluation for determining whether an applicant is disabled under this standard. 20 C.F.R. § 404.1520(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d at 1193, 1194.

At step one, the ALJ must determine whether the applicant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Here, the ALJ concluded plaintiff has not engaged in "substantial gainful activity" since June 4, 2012, the alleged onset date of his disability. [Doc. No. 10-2, at p. 29.]

At step two, the ALJ must determine whether the applicant is suffering from a "severe" impairment within the meaning of Social Security regulations. 20 C.F.R. § 404.1520(a)(4)(ii). The Ninth Circuit has described the ALJ's step-two inquiry as "a de minimis screening device to dispose of groundless claims." *Edlund v. Massanari*, 253 F.3d 1152, 1158 (9th Cir. 2001), quoting *Smolen v. Chater*, 80 F.3d at 1290. "An impairment or

20

combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). For example, a slight abnormality or combination of slight abnormalities that only have a minimal effect on the applicant's ability to perform basic work activities will not be considered a "severe" impairment. *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). Examples of basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1522(b). "If the ALJ finds that the claimant lacks a medically severe impairment, the ALJ must find the claimant not to be disabled." *Webb v. Barnhart*, 433 F.3d at 686.

In this case, the ALJ concluded at step two that plaintiff has the following severe impairments: "major depressive disorder; anxiety disorder; and borderline intellectual functioning." [Doc. No. 10-2, at p. 29.]

If there is a severe impairment, the ALJ must then determine at step three whether it meets or equals one of the "Listing of Impairments" in the Social Security regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the applicant's impairment meets or equals a Listing, he or she must be found disabled. *Id.* Here, the ALJ concluded that the severity of plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of Listing 12.04, Depressive, Bipolar and Related disorders; Listing 12.05, Intellectual Disorders; or Listing 12.06, Anxiety Related Disorders. [Doc. No. 10-2, at p. 30.]

In making this determination, the ALJ considered whether the "paragraph B" criteria ("paragraph D" of Listing 12.05) were satisfied. To satisfy the "paragraph B" criteria ("paragraph D" criteria of Listing 12.05), plaintiff's mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in concentration,

persistence, or pace; or repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. § 404.1520a, § 404, Subpt. P, App. 1, § 12.00. A marked limitation means more than moderate but less than extreme. 20 C.F.R. § 416.926a(e)(2)(i). Repeated episodes of decompensation, each of extended duration, means three episodes within one year, or an average of one episode every four months, each lasting for at least two weeks. 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00C, § 4 (effective Sept. 29, 2016 to January 16, 2017).

At this stage of his analysis, the ALJ concluded plaintiff had only mild restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. [Doc. No. 10-2, at p. 30.] The ALJ also found plaintiff had experienced no episodes of decompensation of extended duration. [Doc. No. 10-2, at p. 30.] Because the ALJ determined plaintiff's mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration, the ALJ concluded the "paragraph B" criteria ("paragraph D" criteria of Listing 12.05) were not satisfied. [*Id.*]

The ALJ also determined the evidence failed to establish the presence of the "paragraph C" criteria of Listings 12.04 and 12.06. [Doc. No. 10-2, at p. 30.] Additionally, the ALJ found that the "paragraph B" criteria of Listing 12.05 were not met because plaintiff did not have a valid verbal, performance, or full-scale IQ of 59 or less. [*Id.*] The "paragraph C" criteria of Listing 12.05 were not met because plaintiff did not have a valid verbal, performance, or full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. [*Id.*] Plaintiff's full-scale IQ was 80 in April 2014, 76 in December 2012, and 78 in 2007. [*Id.* citing Doc. No. 10-7, at p. 166; Doc. No. 10-7, at p. 90; and Doc. No. 10-6, at p. 69.]

The ALJ then found there was "no medical evidence or medical expert testimony to support a finding that any impairment or combination of impairments medically equals any of the considered [L]istings." [Doc. No. 10-2, at p. 31.] However, the ALJ did consider any

limitations imposed by plaintiff's severe medically determinable impairments when assessing the residual functional capacity below. [*Id.*]

If an impairment does not meet or equal a Listing, the ALJ must make a step four determination of the claimant's residual functional capacity based on all impairments, including impairments that are not severe. 20 C.F.R. § 404.1520(e), § 404.1545(a)(2). "Residual functional capacity" is "the most [an applicant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ must determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(5)(i). If the applicant cannot perform past relevant work, the ALJ at step five must consider the residual functional capacity assessment, along with the applicant's age, education, and work experience, to determine whether the applicant could "make an adjustment to other work" that is available in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v); 42 U.S.C. § 1382c(a)(3)(B). While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

A residual functional capacity assessment considers a claimant's "ability to meet the physical, mental, sensory, and other requirements of work. . . ." 20 C.F.R. § 404.1545(a)(4). The physical demands of work activities are "sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching). . . ." 20 C.F.R. § 404.1545(b). Mental activities considered in a residual functional capacity assessment include the abilities to understand, remember, carry out instructions, and respond appropriately to supervisors, co-workers, and pressures in a work setting. 20 C.F.R. § 404.1545(c). Other limiting factors, such as epilepsy, vision, hearing, and pain or other symptoms, may also be considered in a residual functional capacity assessment. 20 C.F.R. § 404.1545(d)&(e). After functional limitations or restrictions are assessed on a function-by-function basis, an individual's residual functional capacity is expressed in terms of

exertional levels: "sedentary, light, medium, heavy, and very heavy." Soc. Sec. Ruling 96-8p (July 2, 1996), 1996 WL 374184.

Here, the ALJ acknowledged at step four that plaintiff did not have any past relevant work. [Doc. No. 10-2, at p. 35.] However, the ALJ found that plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but acknowledged that plaintiff's ability to work "has been compromised by non-exertional limitations." [*Id.* at pp. 31-36.] More specifically, the ALJ's residual functional capacity assessment states as follows:

> [Plaintiff] can perform unskilled work, which means low stress, low concentration, and low memory work. Specifically, low stress unskilled work means that the claimant cannot work with the general public or crowds of co-workers and that he can have only occasional verbal contact with supervisors and coworkers. He can handle only occasional changes in a routine work setting. Furthermore, low concentration unskilled work means that the claimant can be alert and attentive to perform only routine unskilled work tasks. Finally, low memory unskilled work means that the claimant can understand, remember, and carry out only simple work instructions and he can remember and deal with only rare changes in work instructions. The claimant can remember and use good judgment in making simple work-related decisions. He cannot be called upon to perform reading, writing, or math calculations in his head.

[Doc. No. 10-2, at pp. 31-32 (emphasis added).]

In assessing plaintiff's residual functional capacity, the ALJ considered "the entire record." [Doc. No. 10-2, at p. 31-35.] While the ALJ determined that plaintiff's medical impairments could reasonably be expected to cause the alleged symptoms, he also found plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. [*Id.* at p. 32.] For example, the ALJ noted that plaintiff presented testimony and other evidence that he suffered from "low energy, distractibility, feeling overwhelmed, anxiety, panic, and agitation," but it was the ALJ's view that this evidence was inconsistent

with medical records indicating his conditions "have been well managed with medication." [*Id.*]

Since plaintiff had no relevant work, the ALJ considered at step five whether jobs exist in the national economy that plaintiff could perform. [Doc. No. 10-2, at pp. 36-36.] In making this determination, the ALJ considered plaintiff's age, education, work experience, residual functional capacity, and the vocational expert's testimony. [Doc. No. 10-2, at p. 36.] As outlined above, the vocational expert testified than an individual of plaintiff's age, education, work experience, and residual functional capacity would be able to perform the requirements of two representative occupations that are available in the national economy and listed in the Dictionary of Occupational Titles: (1) garment and laundry bagger (DOT No. 920.687-018); and (2) vehicle cleaner (DOT No. 919.687-014). [Doc. No. 10-2, at p. 36, citing Doc. No. 10-2, at pp. 96-97.] Therefore, the ALJ concluded plaintiff is not disabled under SSA regulations. [Doc. No. 10-2, at p. 37.]

### III. *Standards of Review.*

The final decision of the Commissioner must be affirmed if it is supported by substantial evidence and if the Commissioner has applied the correct legal standards. *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Under the substantial evidence standard, the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the record to support more than one rational interpretation, the District Court must defer to the Commissioner's decision. *Id.* "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). "In determining whether the Commissioner's findings are supported by substantial evidence, we must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

1   "The Commissioner's regulations permit claimants to submit new and material
2   evidence to the Appeals Council and require the Council to consider that evidence in
3   determining whether to review the ALJ's decision." *Brewes v. Comm'r of SSA*, 682 F.3d
4   1157, 1162 (9th Cir. 2012). Because it is a "non-final agency action" and the ALJ's
5   decision becomes the final decision of the Commissioner after the Appeals Council denies
6   review, the District Court does not have jurisdiction to review an Appeals Council decision.
7   *Brewes*, 682 F.3d at pp. 1161-1162.

8   "[W]hen a claimant submits evidence for the first time to the Appeals Council, which
9   considers that evidence in denying review of the ALJ's decision, the new evidence is part
10  of the administrative record, which the district court must consider in determining whether
11  the Commissioner's decision is supported by substantial evidence." *Brewes*, 682 F.3d at
12  1159-1163. As defendant contends, the Ninth Circuit in *Brewes* applied the "substantial
13  evidence" standard to determine whether the whole record, including the new evidence,
14  continued to support the ALJ's denial of benefits. *Id.* at 1163. In addition, to justify a
15  remand, the claimant must "demonstrate that there is a 'reasonable possibility' that the new
16  evidence would have changed the outcome of the administrative hearing." *Mayes v.*
17  *Massanari*, 276 F.3d 453, 462 (9th Cir. 2001); *Mengistu v. Colvin*, 537 F. App'x 724, 725
18  (9th Cir. 2013).

19  **IV.     *Sufficiency of the Evidence.***

20          **A.      *The Parties' Positions.***

21          In his Motion for Summary Judgment, plaintiff cites opinions expressed in
22  Dr. Deer's May 18, 2017 Medical Source Statement that conflict with the ALJ's residual
23  functional capacity assessment and argues that these conflicts should have been enough for
24  the Appeals Council to change the ALJ's disability determination. Plaintiff also believes
25  that the new, conflicting opinions expressed by Dr. Deer in the Medical Source Statement
26  are relevant and material to the ALJ's residual functional capacity assessment, and
27  Dr. Deer's treatment records support her opinions. Since Dr. Deer is a treating physician,
28  plaintiff contends that her opinion is entitled under Ninth Circuit precedent to "greater

weight" than the opinions of the "non-treating physicians" that the ALJ relied on to reach the non-disability determination. Because the Appeals Council denied plaintiff's request for review based on the new evidence he submitted, plaintiff contends that the ALJ's disability determination is not supported by substantial evidence. [Doc. No. 13-1, at pp. 4-7, 9.]

Defendant argues that the ALJ's decision is supported by substantial evidence "notwithstanding the later-submitted records from Dr. Deer," so there is no basis to remand or reverse the ALJ's decision. [Doc. No. 17-1, at p. 9.] As defendant points out, plaintiff "does not dispute that substantial evidence in the record supported the ALJ's decision when she decided plaintiff's claims." [*Id.*] Defendant further contends that the updated medical treatment records from Dr. Deer support the ALJ's residual functional capacity assessment and non-disability determination. [Doc. No. 17-1, at pp. 9-13.] Finally, defendant contends there are valid reasons to afford "no weight" to Dr. Deer's May 18, 2017 opinion, so substantial evidence supports the ALJ's decision even if this opinion is taken into consideration. [Doc. No. 17-1, at p. 15.]

### 1. *Dr. Deer's Updated Treatment Notes.*

Plaintiff's counsel submitted additional treatment records from Dr. Deer to the Appeals Council via letters dated June 26, 2017 and October 30, 2017. [Doc. No. 10-2, at pp. 102, 135.] Although some of these records were duplicative, Dr. Deer's medical treatment notes dated September 8, 2016, December 19, 2016, and March 30, 2017 were generated just before and shortly after the ALJ's December 1, 2016 non-disability determination so were not considered by the ALJ. Arguably, these new records are relevant to the disability determination, because they serve to update the administrative record with information about continuing treatment by Dr. Deer for the same conditions addressed in prior treatment records.

In the first new treatment record dated September 8, 2016, Dr. Deer states that plaintiff continued to experience significant symptoms of depression and a "disordered sleep wake cycle." [Doc. No. 10-2, at p. 141.] Dr. Deer also noted that plaintiff's mood

was "good," and his affect was flat. His thought process was concrete; his insight was limited; and his attention, concentration, and memory were intact to recent and remote events. [*Id.*] Dr. Deer continued plaintiff's current medications. [*Id.*]

On December 19, 2016, plaintiff "[decline[d] having his mother accompany him to this appointment," and he told Dr. Deer he was "doing better due to work schedule." [Doc. No. 10-2, at p. 122.] Since the end of November, he had been working part time in four-hour shifts washing dishes at a pizza place and said he liked the job and was getting along well with co-workers. [*Id.*] "He had a job coach who was helping him to get placed (Community Interface)." [*Id.*] However, he was forgetting to take his medications on his days off and his sleep cycle would get reversed. [*Id.*] Dr. Deer commented that plaintiff's symptoms were showing improvement and working on a part-time basis was having a positive effect on his sleep/wake cycle. [*Id.* at p. 123.]

On March 30, 2017, plaintiff told Dr. Deer that he was still working at his part-time job and was enjoying it but was working fewer hours, because the restaurant was not as busy. He was getting along with his mother and was not sleeping through the day as much. [*Id.*] On his days off, he reported he was not doing much but was trying to think of things to prevent boredom and was "[j]ust hang[ing] out with friends, things like that." [*Id.*]

These updated treatment notes support the ALJ's residual functional capacity assessment and non-disability decision, because they indicate plaintiff's depression and anxiety were responding to medication and had improved over time and with the addition of a part-time work schedule. His mood was "good." He demonstrated progress in his employment endeavors because he was working part time, said he enjoyed his work, and was getting along with co-workers. He also demonstrated some independence from his mother by declining to have her accompany him to his appointment with Dr. Deer. There is no suggestion in these updated treatment notes that plaintiff would be unable to work on a full-time basis or adjust to some change in a work place setting. As a result, it is this Court's view that these updated treatment records are consistent with the ALJ's residual functional capacity assessment indicating plaintiff could work full time with multiple non-

exertional limitations to address his cognitive, intellectual, and social limitations, as well as his other symptoms.

## 2. *Dr. Deer's May 18, 2017 Medical Source Statement.*

On May 18, 2017, Dr. Deer completed a form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." [Doc. No. 10-2, at pp. 12-19.] Plaintiff's counsel then forwarded this form to the Appeals Council on June 26, 2017. [*Id.* at 12.]

On the first page, the form requests that Dr. Deer provide her professional opinion in response to two main questions as to how and to what extent plaintiff's impairments affect his ability to perform work-related activities on a full-time basis. [*Id.* at p. 13.] In response to the first main question on the form, Dr. Deer responded that plaintiff's ability to understand, remember, and carry out instructions is affected by his impairment as follows: (1) he has slight restrictions in his ability to understand short, simple instructions; (2) he has marked limitations in his ability to understand, remember, and carry out detailed instructions and his ability to make judgments on simple work-related decisions; (3) he has extreme restrictions in his ability to make complex judgments or decisions. [*Id.* at p. 13.]

In response to the second main question, Dr. Deer responded that plaintiff's impairments affect his ability to respond appropriately to supervisors, co-workers, and work pressures as follows: (1) he has extreme limitations in his ability to interact with the public; (2) he has moderate limitations in his ability to interact appropriately with supervisors and co-workers; and (3) he has extreme limitations in his ability to respond appropriately to changes in a routine work setting. [Doc. No. 10-2, at p. 14.] The form then asks "[w]hat supports this assessment?" Dr. Deer responded as follows: "Patient can handle very small amounts of unskilled, structured and supervised work. Due to his cognitive, intellectual and social limitations, he cannot perform skilled work or be expected to tolerate the stress of a normal work week." [*Id.*]

Dr. Deer described plaintiff's current level of functioning/present daily activities as follows: "Relies on mother "100%; can work (unskilled manual labor) for 6-7 hours,

29

approximately 3 days per week. . . ." [Doc. No. 10-2, at p. 18.] In response to the question about plaintiff's ability to adapt to stresses common to the work environment, Dr. Deer stated as follows: "Can maintain a very limited work schedule with low stress; would not expect patient to adapt to any increase in work demand/stress." [*Id.*]

## C. *Conflicts Between Dr. Deer's Opinions and the ALJ's Residual Functional Capacity Assessment.*

Plaintiff contends that the following opinion statements in Dr. Deer's May 18, 2017 Medical Source Statement as to plaintiff's "current level of functioning" conflict with the ALJ's residual functional capacity assessment: (1) plaintiff "can handle small amounts of unskilled, structured and supervised work;" (2) plaintiff can work (unskilled manual labor) for 6-7 hours, about 3 days per week; and (3) plaintiff "can maintain a very limited work schedule with low stress; would not expect patient to adapt to any increase in work demand/stress." [Doc. No. 13-1, at pp. 4-7, referring to Doc. No. 10-2, at pp. 14, 18.]

In plaintiff's view, the ALJ's residual functional capacity assessment conflicts with Dr. Deer's opinions in two respects. First, the ALJ concluded plaintiff has the residual functional capacity to "perform a full range of work at all exertional levels" but with some specific "non-exertional limitations." [Doc. No. 10-2, at p. 31.] Based on available sources, the ALJ's residual functional capacity assessment indicates the ALJ believes plaintiff would be able to sustain a job on a full-time basis. Under social security regulations, a residual functional capacity assessment determines whether the claimant has "the capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(c). A "regular and continuing basis" means "8 hours a day, for 5 days a week, or an equivalent work schedule." Soc. Sec. Ruling 96-8P (S.S.A. July 2, 1996), 1996 WL 374184. Second, the ALJ concluded that plaintiff can tolerate "occasional changes in a routine work setting." [*Id.*]

## D. *The Weight of Dr. Deer's Opinions.*

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. [Citation omitted.] At least

3:18-cv-01035-BEN(KSC)

where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons. [Citation omitted.] . . . . '[C]lear and convincing reasons are required to reject the treating doctor's ultimate conclusions. [Citation omitted.] Even if the treating doctor's opinion is contradicted by another doctor, . . . this opinion [may not be rejected] without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing. [Citation omitted.]" *Lester v. Chater*, 81 F.3d 821, 830–831 (9th Cir. 1996).

"The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. [Citation omitted.] As is the case with the opinion of a treating physician, the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician. [Citation omitted.] And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. [Citation omitted.] [¶]The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester v. Chater*, 81 F.3d at 831.

"If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.'" *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record," certain specific factors must be considered to determine the weight the opinion should be given. *Id.* at 631. These factors include the following: the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; . . .the "nature and extent of the treatment relationship" between the patient and the treating physician; . . . the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the

physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [the SSA's] 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record." *Id.*

"[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). A medical opinion can also be legitimately discounted or rejected if it is inconsistent "with the record as a whole." *Wells v. Colvin*, 727 F.3d 1061, 1072 (10th Cir. 2013). "[W]hen an examining physician provides 'independent clinical findings that differ from the findings of the treating physician,' such findings are 'substantial evidence.'" *Orn v. Astrue*, 495 F.3d at 632. "A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).

Even though Dr. Deer is a treating physician, the opinions she expressed on the Medical Source Statement, are not enough to justify plaintiff's current request for reversal and remand. As defendant contends, there are valid reasons to afford little or "no weight to the opinion," so substantial evidence supports the ALJ's decision notwithstanding Dr. Deer's opinions on the Medical Source Statement. [Doc. No. 17-1, at p. 15.] First, Dr. Deer's opinions in the Medical Source Statement are brief and conclusory (*i.e.*, they are unsupported by any facts, reasons, or objective medical findings). Since Dr. Deer did not explain the basis or reasons for the opinions she expressed in the Medical Source Statement, it is unclear why she believed plaintiff could not work full time or adjust to changes in a work place.

Third, contrary to plaintiff's contention, Dr. Deer's treatment notes are inconsistent with the opinions she expressed in the Medical Source Statement. When viewed in their entirety, Dr. Deer's medical treatment notes indicate her only role was to treat plaintiff for anxiety and depression, and she was not tasked with evaluating whether plaintiff was

32

able to function in any type of work setting. There is also nothing in the record to indicate she was a vocational expert or had any expertise in this area. Although the treatment notes do include some superficial discussions about employment and/or employment prospects, there is nothing in the treatment notes to suggest Dr. Deer had any discussions with plaintiff or his mother about his ability to work. Nor is there anything in the treatment notes to suggest Dr. Dear had any beliefs about plaintiff's ability or inability to work on a part- or full- time basis until she completed the Medical Source Statement on May 18, 2017, long after the ALJ's non-disability opinion was issued on December 1, 2016.

The first mention of employment was made in Dr. Deer's initial treatment notes dated September 8, 2015. These notes show she was aware plaintiff had been able to gain experience by working in the kitchen at an elder care facility and was awaiting a decision on another job at T.J. Maxx. [Doc. No. 10-8, at p. 15.] Next, treatment notes dated April 11, 2016 indicate Dr. Deer was advised that plaintiff was attending a vocational training program at the Regional Center and was working with the Regional Center to find employment. [Doc. No. 10-8, at pp. 27-29.] When plaintiff's mother commented during this appointment that plaintiff was only receiving "minimal services" from the Regional Center, Dr. Deer "STRONGLY encouraged [plaintiff's] mother to follow up with [the] case manager and pursue resources." [Doc. No. 8, at p. 28.] These treatment notes only suggest Dr. Deer believed it was important for plaintiff to find work.

In a later treatment note dated December 19, 2016, Dr. Deer stated plaintiff had been working part time in four-hour shifts washing dishes at a pizza place; was "doing better due to work schedule;" liked the job; and was getting along with co-workers. [Doc. No. 10-2, at p. 122.] The next treatment notes dated March 30, 2017 state that plaintiff was still working at his part-time job but was working fewer hours because the restaurant was not as busy. [Doc. No. 10-2, at p. 122.] These treatment notes only indicate Dr. Deer was aware that plaintiff had made significant progress in his efforts to find employment and his work schedule was having a positive effect on his symptoms.

3:18-cv-01035-BEN(KSC)

Fourth, the opinions expressed by Dr. Deer on the Medical Source Statement are inconsistent with the record as a whole, including opinions expressed by examining physicians and non-examining physicians. Most significantly, Dr. Deer's opinions are inconsistent with the complete psychological evaluation, including testing, which was prepared by Dr. Whitehead. [Doc. No. 10-7, at pp. 85-91.] Based on his observations during the evaluation and on the objective testing that was completed as part of the evaluation, it was Dr. Whitehead's opinion that plaintiff was "capable of function at a variety of work activities that require simple task performed at a constant level." [*Id.* at 90.] In addition, as part of the evaluation Dr. Whitehead expressed opinions on many issues that are important to the ALJ's residual functional capacity assessment, all of which contradict Dr. Deer's opinions. Specifically, with respect to plaintiff's ability to respond appropriately to usual work conditions and his ability to deal with change in a routine work setting, Dr. Whitehead's stated as follows: "His overall history and current testing results show low average to borderline ability, which indicates no significant impairment in this capacity." [*Id.* at p. 91.] Dr. Whitehead also stated that plaintiff's "prognosis" was "good," because "he seems able to perform simple tasks at a constant level of performance." [*Id.*]

Fifth, opinions by two other examining physicians about plaintiff's ability to work also seem to be contrary to the those expressed by Dr. Deer. Around the time plaintiff went to the Regional Center to gain assistance in finding employment, he was examined and evaluated by two different physicians associated with the Regional Center. [Doc. No. 10-7, at pp. 162-167; 173-178; Doc. No. 10-7, at pp. 168-172.] First, plaintiff was referred to Dr. Weld "to assess his current level of intellectual and adaptive functioning and to help with eligibility determination for the San Diego Regional Center." [*Id.* at p. 162.] Dr. Weld completed objective testing, including some of the same testing completed by Dr. Whitehead. [*Id.* at p. pp. 165-166.] Her overall diagnostic impressions of plaintiff's cognitive functioning were fairly consistent with the impressions of Dr. Whitehead, but she did not make specific findings about his ability to work. [*Id.* at

34

pp. 166-167.] Second, Dr. Pionk, a Development Behavioral Physician Consultant for the Regional Center, completed a medical evaluation based on information from plaintiff, his mother, and several other sources. Dr. Pionk concluded plaintiff's anxiety and depression were stable on his current medications and had resulted in "significant behavioral progress." [*Id.* at p. 177.] It was her opinion that plaintiff would benefit from a program through the Regional Center that involves job coaching and life building skills. [*Id.* at p. 178.] In addition, the Regional Center determined plaintiff was eligible for services. In short, in May 2014, the Regional Center believed based on its assessment of plaintiff that he was employable and would benefit from services despite cognitive and adaptive abilities in the low range. There is nothing to indicate they believed he was only capable of part-time work or would not be able to adapt to a work place setting.

Sixth, the record includes assessments by two non-examining state agency physicians, N. Haroun, M.D., and Paul Klein, Psy.D. Both physicians reviewed the evidence available to them at the time of their assessments, and both concluded that plaintiff had some mild and moderate limitations, but his impairments were not severe enough for him to be considered disabled. [Doc. No. 10-3, at pp. 14-16; 46-53; 59-65.] The opinions of these physicians are also relatively consistent with the ALJ's residual functional capacity assessment and non-disability determination. [*Id.*]

Finally, as defendant points out, the ALJ's decision acknowledges that plaintiff has some significant symptoms and limitations, and, as a result, the ALJ's residual functional capacity assessment is very restrictive. There is nothing to indicate Dr. Deer considered the restrictions and limitations outlined in the ALJ's residual functional capacity assessment. Without more, it appears that the ALJ's restrictions adequately address the concerns identified by Dr. Deer on the Medical Source Statement. [Doc. No. 17-1, at p. 17.] For example, the ALJ restricted plaintiff to unskilled, low stress, low concentration, and low memory work involving only simple work instructions and "only rare changes in work instructions." [Doc. No. 10-2, at pp. 31-32.]

3:18-cv-01035-BEN(KSC)

In sum, there are specific and legitimate reasons for Dr. Deer's May 18, 2017
Medical Source Statement to be discounted or rejected. Dr. Deer's treatment notes show
only that she was treating plaintiff for depression and anxiety, he was responding to
medication, and his anxiety and depression were stable and had improved over time.
There are no suggestions in these treatment notes that could serve as basis for the
opinions expressed by Dr. Deer in the May 18, 2017 Medical Source Statement that
plaintiff would be unable to tolerate changes in a routine work setting or would be unable
to work on a full-time basis. Under the circumstances, there is no reason to believe the
Medical Source Statement completed by Dr. Deer would have changed the outcome of
the ALJ's decision. Under these circumstances, reversal or remand for consideration of
this evidence would be futile.

## *Conclusion*

Based on a careful review of the record, including the new evidence submitted to
the Appeals Council, it is this Court's view that substantial evidence supports the ALJ's
decision that plaintiff is not disabled and has the residual functional capacity to perform
jobs available in the national economy. The ALJ cited more than enough evidence to
support this conclusion. [Doc. No. 10-2, at pp. 31-37.] There is nothing in the new
evidence submitted by plaintiff to the Appeals Council that would justify granting
plaintiff's request for a reversal of remand of the ALJ's decision to consider this
evidence. Accordingly, it is recommended that the District Court affirm the ALJ's
decision to deny benefits by issuing an order GRANTING defendant's Motion for
Summary Judgment and DENYING plaintiff's Motion for Summary Judgment.

This Report and Recommendation is submitted to the United States District Judge
assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l) and Civil Local
Rule 72.l(d). Within ten (10) days after being served with a copy of this Report and
Recommendation, "any party may serve and file written objections." 28 U.S.C. §
636(b)(1)(B)&(C). The document should be captioned "Objections to Report and
Recommendation." The parties are advised that failure to file objections within this specific

3:18-cv-01035-BEN(KSC)

time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: August 9, 2019

Hon. Karen S. Crawford
United States Magistrate Judge